UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br>v.<br><br>DEANGELO M. GARCIA,<br><br>                              Defendant. | Case No. 15-CR-119-JPS<br><br><br>ORDER |

On June 16, 2015, a federal grand jury returned a two-count indictment against the defendant, Deangelo Garcia, charging him with attempted Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951 and 2, and discharge of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c) and 2. (Docket #4). Before the Court is the defendant's motion to suppress all evidence obtained as a result of a traffic stop and the detention of the defendant on June 11, 2015. (Docket #12). The defendant's motion also requests an evidentiary hearing "to develop the facts" concerning the stop of the vehicle and the detention of the defendant, and to determine what evidence would be "fruits of the unlawful seizure and detention." *Id.* at 4. The Court will grant in part and deny in part the defendant's motion to suppress, for the reasons outlined below.

1.      BACKGROUND[1]

On June 11, 2015, Milwaukee Police Department ("MPD") Officers David Sturma ("Officer Sturma") and Eric Dillman ("Officer Dillman") went to 1825 North 13th Street, Milwaukee, Wisconsin, in search of a wanted

---

[1]The Court's summary of the facts is taken from the police report that both the defendant and the government submitted. (*See* Docket #13-1); (Docket #14-1). For the sake of clarity, the Court will cite to the record only as necessary.

subject named Mario A. Jacobs ("Jacobs"). Jacobs had a felony warrant out for his arrest and the officers were part of the Fugitive Apprehension Unit. The officers went to that particular address because they knew from MPD reports the mother of Jacobs' child, Dereaka M. Parker, resides at that residence (along with Jacobs' son). The officers also knew from previous MPD reports that Jacobs was known to operate a maroon colored Toyota Camry bearing Wisconsin plates of 457-WAK.

Upon arriving at the scene, Officer Dillman observed that the maroon Toyota Camry was parked outside the address. The officers then conducted surveillance of the address. Shortly after arriving, the officers observed an unknown car enter the parking lot near the residence. The officers then observed three subjects exit the car, walk towards the northern door of the apartment, and enter the residence. The officers then called for backup.

While the subjects were inside, Officer Sturma exited his unmarked squad car and approached the residence on foot. He concealed himself behind a row of bushes and monitored the residence using a pair of binoculars. At 9:55 p.m. Officer Sturma—from his standpoint in the bushes—"observed two subjects quickly exit the rear, northern door of the residence and enter a parked auto in the parking lot." (Docket #13-1 at 7). Because it was night-time and heavy rain was falling, Officer Sturma was not able to identify if either subject that exited the residence and got into the car was Jacobs. Officer Sturma "did observe, however, that the height and weight of the two subjects appeared to be similar to that of [Jacobs]." *Id.*

The car the subjects entered was another Camry (this time black) with Wisconsin plates of 814-VNA. Officer Sturma notified Officer Dillman and the backup squad he had radioed for—Squad 974—that two subjects left the area of the residence and a traffic stop needed to be conducted. Officer

Sturma gave the location and direction of travel to the responding squads and Officer Dillman and Squad 974 caught up with the black Camry. The black Camry entered a parking lot and Officer Dillman and Squad 974 turned on their emergency lights and conducted a traffic stop.

Officer Dillman then spoke to the driver of the car, who identified himself as Julius Betton ("Betton"); Betton stated that he did not have any identification (including a drivers license), had never been arrested, and did not know his social security number. The passenger of the vehicle identified himself via an identification card as Anthony Crudup. Officer Dillman then ran a wanted check on both individuals; Betton was not on file with the Department of Transportation ("DOT") and Crudup had two outstanding municipal warrants for his arrest. A license plate check of the car also revealed that it had been stolen on June 4, 2015. Both subjects were placed in custody. During that time, Betton was informed that he was not on file with the DOT; Betton declined, despite further inquiry by the officers, to provide more information to clarify his identity. Both subjects were then booked and fingerprinted. Betton's fingerprints revealed that he was actually Deangelo Garcia, the defendant in the instant matter. Garcia had multiple warrants out for his arrest.

The defendant argues that all evidence from the stop of the car he was driving, and his detention, should be suppressed. (Docket #13 at 3). This is so, according to the defendant, because the police did not have reasonable suspicion to stop the car—*i.e.* reasonable suspicion that Jacobs was in the vehicle—and there was no other reason to stop and detain the defendant. *Id.* The defendant also requests an evidentiary hearing to clarify the facts. *Id.* at 4.

The Court will begin by discussing the defendant's request for an evidentiary hearing, before turning to the parties' arguments for and against suppression.

2. DISCUSSION

    2.1    An Evidentiary Hearing is Unnecessary

Turning first to the defendant's request for an evidentiary hearing, the Court is obliged to deny that request. Courts are not required to hold an evidentiary hearing every time a motion to suppress is filed. *See United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007) ("Evidentiary hearings are not required as a matter of course…"). "Evidentiary hearings are warranted only when the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion." *United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998). Seventh Circuit precedent "places the onus on the defendant seeking an evidentiary hearing to 'specifically…allege[] a *definite disputed factual issue,'* and to demonstrate its materiality." *McGaughy*, 485 F.3d at 969 (emphasis in original); *accord United States v. Curlin*, 638 F.3d 562, 565 (7th Cir. 2011).

Here, the defendant requests an evidentiary hearing to further develop "factual issues that are unclear in the police report." (Docket #13 at 4). To illustrate his perception that there is a dearth of facts, and lack of clarity in those facts, the defendant footnoted his brief with various places where the facts are unclear or need to be developed more fully. *See id.* at 2-3. But, the footnotes do not establish a material factual dispute, which would demonstrate the need for an evidentiary hearing; instead, those footnotes merely offer observations as to what factual details are missing, and

conjecture as to why that is so. *See, for example*, *id.* at 2 n.4 ("The police report does not indicate if these individuals were males, females, or both, but clearly none of them were Jacobs or that would be in the report."); *id.* at 2 n.2 ("The police report does not indicate…where the car was parked in relation to the apartment.…[T]he police apparently had no idea how long it had been there or who drove it there."). This is not enough to warrant an evidentiary hearing, especially given that nowhere in the defendant's brief does he *actually say* there is a factual dispute, much less a material one.

The defendant does say, in his reply brief, that if the government is "content to not hold a hearing," then the Court should rule on whether the traffic stop was unlawful based on the police report, alone. (Docket #15 at 6). It appears that the government requests that the Court do just that, given that it has cited only the police report to justify the stop, and opposed the defendant's request for an evidentiary hearing. (*See* Docket #14). As such, the Court will proceed to the merits of the defendant's motion to suppress.

2.2     The Merits of the Defendant's Motion to Suppress

The defendant argues that the police did not have reasonable suspicion to conduct a traffic stop of the car *ab initio*, because: (1) "the police report fails to show that Jacobs was present, or even likely to be, present at the residence"; (2) the police had insufficient evidence to believe that one of the two men leaving the residence was Jacobs, especially given that the car they left in was not linked to Jacobs; and (3) the mere assertion that the two men exiting the residence matched Jacobs' height and weight, even in light of the totality of the circumstances, fails to establish reasonable suspicion. (Docket #15 at 4-5). The Court will first discuss the legal standard applicable to the defendant's motion, before analyzing the substance of the parties' arguments for and against suppression.

### 2.2.1 Reasonable Suspicion—Legal Standard

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. "The Supreme Court has characterized a traffic stop as a form of an investigative stop," *United State v. Shields*, — F.3d —, 2015 WL 3654318, at *7 (7th Cir. June 15, 2015) (citing *Rodriguez v. United States*, — U.S. —, 135 S.Ct. 1609, 1613 (2015)), and while an investigatory stop is typically "'limited to a brief, non-intrusive detention,'" it is nonetheless a Fourth Amendment seizure, *see id.* at *5 (quoting *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990)). *See also Heien v. North Carolina*, — U.S. —, 135 S. Ct. 530, 536 (2014)) ("A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment.").

Accordingly, an investigatory stop is justified—and complies with the Fourth Amendment—"if the brief detention is based on reasonable suspicion that the detained individual has committed or is about to commit a crime." *United States v. Uribe*, 709 F.3d 646, 649-50 (7th Cir. 2013) (citing, *inter alia*, *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). An officer conducting such a stop "must be able to point to 'specific and articulable facts' that suggest criminality so that he is not basing his actions on a mere hunch." *Id.* (quoting *Terry*, 392 U.S. at 21); *see also United States v. Green*, 111 F.3d 515, 519 (7th Cir. 1997) ("The officer 'may not, however, rest only upon his intuition; the officer must provide specific and objective facts justifying the stop.") (quoting *United States v. Troka*, 987 F.2d 472, 474 (7th Cir. 1993)) (internal quotation marks omitted).

"Ultimately, a court's determination of reasonable suspicion 'must be based on common-sensical judgments and inferences about human behavior,'" *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting

*Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)), and a court must examine foregoing, and thus the reasonableness of a stop, "based on the totality of the circumstances known to the officer at the time of the stop." *United States v. Amaral-Estrada*, 509 F.3d 820, 827 (7th Cir. 2007) (citing *United States v. Wimbush*, 337 F.3d 947, 949 (7th Cir. 2003)).

>   2.2.2   The Officers Did Not Have Reasonable Suspicion to Conduct the Traffic Stop

The defendant states that, even "charitably," the best the police had "was a hunch that Jacobs might be present at the 13th Street address," (Docket #15 at 4), given that he was never actually observed at that address during the entire time the officers were there, and the residence was that of his child's mother and not his. *Id.* True, the car that he was known to drive was at the address, the defendant continues, but that car "belonged to the person who lived at the residence"—namely, Dereaka Parker, his child's mother. *Id.* at 5.

At bottom, the defendant argues that "the police relied on an observation from the bushes, in heavy rain, and through binoculars to confirm nothing more than the build of Jacobs was similar to the two men getting in the black Camry." *Id.* at 5. And even that, the defendant argues, is suspect, given that the weights and heights of the two people getting into the car were not even similar to each other—"Garcia was 5'6" and 135 pounds and his companion was 5'7" and 170 pounds." *Id.* at 3 n.1.

The government argues, rather half-heartedly, that the investigatory stop was supported by reasonable suspicion because: (1) the suspected fugitive "was observed…at a residence known to be associated with the fugitive"; (2) "the vehicle the fugitive was known to drive…was parked in the parking lot of the residence…"; and (3) "Garcia was observed quickly

Page 7 of 11

exiting the known residence associated with the fugitive, and matched the physical description of the fugitive." (Docket #14 at 1). Thus, according to the government, "based on the totality of the circumstances, the officers had specific and articulable facts, taken along with the reasonable inferences of those facts, which provided the officers with reasonable suspicion" to instigate a traffic stop of the defendant and his passenger. *Id.* at 8.

The Court finds that the investigatory stop was not supported by reasonable suspicion. The issues with this investigatory stop are legion, and it would be charitable indeed to say the stop was based on a hunch; truth be told, characterizing this stop as a *lucky guess* may be more than is warranted. Whether it is characterized as a hunch, a lucky guess, or a coin flip, the stop does not even come close to comporting with the Fourth Amendment.

What did the police really have to justify the stop? They observed three individuals enter a residence that was not the fugitive's, but was associated with him. They then observed, shortly thereafter, *only two individuals* leave the residence and enter a car that was not associated with the fugitive whatsoever. Keep in mind that, at no time was the fugitive ever confirmed to be at the residence, which would have at least raised the possibility that one of the individuals leaving the residence may have been Jacobs.[2] Of course, a car that Jacobs was known to use was at the residence, so perhaps one could infer that he was there, but this inference is severely

---

[2]And this is the exact reason why the government's attempts to analogize this case to *Amaral-Estrada* fail without need for elaborate discussion. Specifically, in *Amaral-Estrada*, DEA agents were able to "pinpoint the location of the cell phone [the suspect used] at one of three residential units" near the address under surveillance. 509 F.3d at 822. Here, the officers had no idea if Jacobs was ever present at the residence in question—he was neither observed at the residence, nor was there any other evidence (other than a car he was known to use) to suggest as much.

Page 8 of 11

Case 2:15-cr-00119-JPS   Filed 07/29/15   Page 8 of 11   Document 16

undermined when considering that the car was parked outside the *registered owner* of the car's residence.

What is left, then, is that two individuals, whose "height and weight …appeared to be similar" to Jacobs', exited the residence rather quickly. (Docket #14-1 at 1). And, as the defendant points out with regard to the quick exit: "Is it really suspicious [that the subjects exited quickly,] given that there was…heavy rain? Who wouldn't quickly exit?" Plus, as the Court pointed out above, the conclusory statement in the police report that the height and weight of the individuals that exited the residence were similar to that of Jacobs is suspect as well, given Garcia was an inch shorter and *thirty-five* pounds lighter than his passenger—which is a discernible difference on a 5'6" frame. And, moreover, the government never offers what Jacobs' height and weight were to make a meaningful comparison.

So what were the specific and articulable facts the officers had to justify reasonable suspicion? The government argues that the two men "matched the description of the fugitive" (*see* Docket #14 at 10), based on the officers' nighttime observation, in heavy rain, through binoculars, from bushes far enough away from the residence *to require binoculars.* This is pure malarkey. Indeed, the police report expressly states that Officer Sturma "was unable to *identify* if either subject was Jacobs." (Docket #14-1 at 1) (emphasis added).

More importantly, to endorse the instant investigatory stop would set a dangerous precedent. To wit, accepting the government's position, anyone leaving a place where a suspected fugitive was known to be, who matched the height and weight of that person, could be pulled over and seized. The Fourth Amendment requires more than that. There must be some additional

Page 9 of 11

Case 2:15-cr-00119-JPS   Filed 07/29/15   Page 9 of 11   Document 16

identification undertaken before suspicion, let alone *reasonable suspicion* will be found. As stated in *Green*:

> That on one occasion a car is parked on the street in front of a house where a fugitive resides is insufficient to create reasonable suspicion that the car's occupants had been or are about to engage in criminal activity. The officers did not claim that the occupants fit the description of [the fugitive];[3] that they were seen entering or leaving the house,[4] or talking with the [the fugitive]; or that the car was seen in front of the house on multiple occasions or at strange times. Thus, the *Terry* stop was not justified at its inception.

111 F.3d at 520.

The Court finds the Seventh Circuit's words in *Uribe* particularly fitting here: "The government provided no evidence to tip the scales from a mere hunch to something even approaching reasonable and articulable suspicion, despite attempting to justify a detention based on one observed incident of completely innocent behavior in a non-suspicious context." 709 F.3d at 652.

3. CONCLUSION

For all of the reasons noted above, the Court is obliged to deny the defendant's motion to suppress, to the extent that it requests an evidentiary hearing, and grant the defendant's motion to suppress in all other respects. The evidence obtained as a result of the stop and detention of the defendant—namely, the false identification provided by the defendant during the stop, and that he was driving a stolen car (*see* Docket #15 at 6 n.2)—must be excluded.

---

[3] And by fit the description, the Seventh Circuit surely meant more than the height and weight of an individual.

[4] The "house" meaning the *actual home* of the fugitive, of course.

Accordingly,

IT IS ORDERED that the defendant's motion to suppress (Docket #12), be and the same is hereby GRANTED in part and DENIED in part, as outlined above.

Dated at Milwaukee, Wisconsin, this 29th day of July, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge